

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

—————————————————

No. 02-19-00321-CV

—————————————————

JOHN DOE, Appellant

V.

UNIVERSITY OF NORTH TEXAS HEALTH SCIENCE CENTER; DR. MICHAEL WILLIAMS, INDIVIDUALLY IN HIS OFFICIAL CAPACITY; AND DR. FRANK FILIPETO, INDIVIDUALLY IN HIS OFFICIAL CAPACITY, Appellees

On Appeal from the 153rd District Court
Tarrant County, Texas
Trial Court No. 153-303463-18

Before Sudderth, C.J.; Gabriel and Bassel, JJ.
Memorandum Opinion by Justice Bassel

**MEMORANDUM OPINION**

## I. Introduction

In a single issue, Appellant John Doe argues that Appellees University of North Texas Health Science Center, Dr. Michael Williams, and Dr. Frank Filipeto (both sued in their official capacity) denied Appellant the rights he was due under the Texas Constitution to reenroll in medical school after he took a leave of absence. Appellees filed a plea asserting that Appellant's claims were barred by sovereign immunity. The trial court granted the plea and dismissed the suit with prejudice.

Appellant's due-course-of-law claim faces an obstacle: the process rights of students dismissed for academic reasons are limited—generally requiring no hearing at all before dismissal. He tries to sidestep this obstacle by claiming that Appellees violated the process standards that they set for themselves in an agreement governing his leave of absence. But to establish a valid constitutional claim, Appellant must do more than claim that Appellees did not follow their agreement. Nor does Appellant explain why he failed to receive the necessary level of process when he acknowledges that he was able to appeal the decision in question and challenges only the sufficiency of that process with a conclusory statement that it was not "meaningful." Thus, we conclude that Appellant failed to plead a valid constitutional claim that overcomes Appellees' sovereign-immunity protections, and the trial court properly granted Appellees' plea to the jurisdiction. We affirm.

## II. Factual and Procedural Background

The factual record is sparse. We set forth the entirety of the bare-bones factual allegations of Appellant's amended petition; in essence, they allege that he took a leave of absence from medical school and experienced a deprivation of process when he was denied the opportunity to reenroll (we highlight the last paragraph of the factual allegations that apparently are the focus of Appellant's claimed process violation):

11. In the Fall of 2014, [Appellant] began attending the Texas College of Osteopathic Medicine ("TCOM")[,] which is a part of UNTHSC and not a separate entity. [Appellant's] first three years at TCOM were uneventful as [Appellant] worked successfully to complete his medical degree. However, during [Appellant's] intensive fourth-year rotations, [Appellant] began experiencing difficulties with the TCOM administration. Specifically, Defendants repeatedly failed to submit the necessary documentation to [Appellant's] fourth-year medical rotation sites. It is incumbent upon TCOM's administration to submit the proper paperwork so students can properly participate in medical training to each rotation site. Beginning with [Appellant's] third rotation site, Defendants failed to submit the requisite paperwork on his behalf; however, [Appellant] managed to successfully complete his third rotation.

12. Following the completion of [Appellant's] third rotation, [Appellant] secured a rotation site for his fourth rotation with no assistance from Defendants. However, just as before, Defendants failed to submit the necessary paperwork to [Appellant's] fourth rotation site. Unlike the previous occurrence, [Appellant] was unable to overcome Defendants' failure, and the administrator of the fourth rotation site rescinded [Appellant's] position.

13. Thereafter, [Appellant] was summoned by Defendants' Director of Student Services to appear before TCOM's Student Performance Committee ("SPC"). [Appellant] was interrogated by the SPC as to why [Appellant had] failed to finalize his position with his fourth rotation site. In response, [Appellant] explained that the failure to finalize his position with the fourth rotation site was not due to a lack of

3

effort on his part[] but was due to the failure of Defendants to meet their obligation to submit the necessary paperwork. Facing such an unexpected inquisition, [Appellant] requested a one-year Leave of Absence ("LOA"), which was later granted by Assistant Vice Dean Dr. Frank Filipeto on November 9, 2016.

> 14. *According to the terms of [Appellant's] LOA, [Appellant] was required to re[]enroll at TCOM with Defendants by July 2017 (the "Re[]enrollment Deadline"). However, before [Appellant] had an opportunity to re[]enroll, [Appellant] was formally dismissed by Defendants. Defendants dismissed [Appellant] in violation of the LOA agreement, prior to the expiration of the Re[]enrollment Deadline, and without any notice or opportunity to participate by [Appellant]. [Appellant] properly appealed the decision; however, [Appellant's] request was immediately denied without any meaningful opportunity for [Appellant] to be heard.* [Emphasis added.] [Citation omitted.]

Though not alleged in the petition, Appellant added a detail to his claims in a subsequent pleading he filed. There, he asserted that the decision denying his reenrollment occurred on July 21, 2017.

In pleading his cause of action for a due-course-of-law violation, Appellant characterizes his view of the process that he was denied but adds no more factual detail than in the paragraphs quoted above regarding how the deprivation occurred:

> According to the terms of the LOA, [Appellant] had until July 2017 to re[]enroll at TCOM. Before [Appellant] had an opportunity to re[]enroll, Defendants dismissed [Appellant] without providing a hearing or giving [Appellant] an opportunity to participate in any meaningful way.

Appellees answered Appellant's suit and filed a plea to the jurisdiction asserting that sovereign immunity barred Appellant's claim. That plea had three themes: (1) the trial court should defer to Appellees' decisions on an academic matter in view of Appellant's failure to allege that their decision was arbitrary and capricious or made in

4

bad faith; (2) Appellant received all the process that he was due; and (3) Appellant failed to avail himself of the process that he was accorded.

The trial court conducted a hearing on Appellees' plea. That hearing focused the controversy on the process that Appellant was due because both sides agreed that he held a protectible interest for which he could not be deprived without being accorded some process. The parties also agreed that Appellees had acted for academic reasons and that Appellant was entitled only to the limited process due in that context. As a basis to deny the plea, Appellant's counsel focused the trial court on the two-sentence paragraph from the petition highlighted above (paragraph 14). The basis of Appellant's argument to deny the petition was driven by the petition and stated that "based on the pleadings and language in the pleadings, our position is that there is sufficient evidence here to show at least a bad faith claim that we can investigate." At the hearing, Appellant did not seek to adduce evidence or ask for an opportunity to amend his petition.

The trial court granted the plea to the jurisdiction and dismissed Appellant's claim with prejudice. This appeal ensued.

### III. Appellant Failed to Plead a Valid Constitutional Claim

In his sole issue, Appellant argues that he pleaded a valid constitutional claim for violations of his fundamental rights. Appellant contends that he had a fundamental right to complete his medical degree and that he was entitled to due

5

process before Appellees dismissed him from medical school. We set forth the standard of review and applicable law and then apply those to the facts before us.

## A.     Standard of Review

No one disputes that Appellee University of North Texas Health Science Center and the individual Appellees are state actors protected by sovereign immunity. Unless that immunity is waived, the trial court is deprived of subject-matter jurisdiction. *Tex. Tech Univ. Health Scis. Ctr. v. Enoh*, 545 S.W.3d 607, 616 (Tex. App.—El Paso Dec. 14, 2016, no pet.). A plea to the jurisdiction is the appropriate procedural vehicle to raise a jurisdictional challenge based on sovereign immunity. *Id.* We review the question of whether the trial court had subject-matter jurisdiction under a de novo standard of review. *Id.*

Here, the trial court heard no evidence; its determination was based solely on the allegations in Appellant's amended petition. Three principles govern our review of a plea directed to the sufficiency of the pleadings:

- "[W]e determine whether the plaintiff has met his burden by pleading facts that affirmatively demonstrate the trial court's subject[-]matter jurisdiction." *Id.*

- "[W]e construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent, and accept as true the factual allegations in the pleadings." *Id.*

- "If the pleadings are insufficient to establish jurisdiction but do not affirmatively demonstrate an incurable defect, then the issue is one of pleading

6

sufficiency[,] and the plaintiff should be afforded the opportunity to amend." *Id.* at 616–17. "However, if the pleadings affirmatively negate the existence of the trial court's jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 617.

Also, a plaintiff does not meet the burden to plead facts affirmatively demonstrating jurisdiction with conclusory allegations; as we have held, if conclusory allegations were sufficient, "the jurisdictional inquiry would become meaningless." *City of Forest Hill v. Cheesbro*, No. 02-18-00289-CV, 2019 WL 984170, at *2 (Tex. App.—Fort Worth Feb. 28, 2019, no pet.) (mem. op.).

## B. Applicable Law

### 1. To establish a waiver of sovereign immunity based on a constitutional claim, a petition must allege a facially valid constitutional claim.

"[S]overeign immunity does not bar a suit to vindicate constitutional rights[.]" *Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015) (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). That said, not every suit alleging a constitutional violation causes a waiver of sovereign immunity; no waiver occurs if the constitutional claims are facially invalid. *See id.*; *see also Andrade v. NAACP of Austin*, 345 S.W.3d 1, 11 (Tex. 2011); *Lamar Univ. v. Jenkins*, No. 09-17-00213-CV, 2018 WL 358960, at *5 (Tex. App.—Beaumont Jan. 11, 2018, no pet.) (mem. op.) (holding that a facially invalid procedural due-process claim did not waive sovereign immunity).

7

**2. We analyze a claim under the Texas Constitution's due-course-of-law provision in harmony with interpretations of the Due Process Clause of the United States Constitution and utilize a two-part test to determine whether a due-course claim exists.**

We set the parameters of our analysis by noting that the Texas Supreme Court recently observed that the wording of the Texas Constitution's due-course-of-law provision differs slightly from the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Mosley v. Tex. Health & Human Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019).[1] The slight textual differences do not create material distinctions in the meaning of the two provisions, and thus, Texas courts interpret our constitution's due-course provision by looking to the federal courts' interpretations of the Due Process Clause. *Id.* ("While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," we regard these terms as without meaningful distinction and thus 'have traditionally followed contemporary federal due[-]process interpretations of procedural due[-

---

[1]As explained in *Mosley*,

> The Texas Constitution's due-course-of-law guarantee provides that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. It is nearly identical to the Fourteenth Amendment's due-process clause, which provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

593 S.W.3d at 264.

]process issues.'" (quoting *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995))).

Texas courts apply a broad two-part test in deciding a due-course claim. *Id.* That test turns on whether a plaintiff "(1) ha[s] a liberty or property interest that is entitled to procedural due[-]process protection; and (2) if so, [a determination] what process is due." *Id.*

Appellees agree that Appellant has a protectible liberty or property interest sufficient to entitle him to due-course protection. This concession pretermits the need for further discussion of what rises to the level of a protectible interest. Our focus will be on what process is due.

### 3. In making our determinations of what process is due, we must defer to decisions that are based on the professional judgment of educators.

A particular set of due-process/due-course rules apply in an academic setting; these rules require that courts give deference to the decision makers in that setting. These rules are derived from the federal precedents establishing the boundaries of due-process protections that guide us in determining the scope of due-course protections. Our court has relied on that guidance to explain why we accord deference to academic decisions.

Our most comprehensive discussion of these precedents, which set the limits of our review of academic decisions, occurred in *Tobias v. University of Texas at*

*Arlington*, 824 S.W.2d 201, 211 (Tex. App.—Fort Worth 1991, writ denied).[2] We cited

two opinions from the United States Supreme Court as lodestars for the principle of

limited review of academic decisions. *See id.* at 207–08 (citing *Bd. of Curators of Univ. of

Mo. v. Horowitz*, 435 U.S. 78, 92, 98 S. Ct. 948, 956 (1978), and *Regents of Univ. of Mich.

v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 513 (1985)). The principle we gleaned

from these cases is that courts are ill-equipped to second-guess academic decisions

and that we may engage in that second-guessing only if there are allegations or proof

that a decision was based on something other than professional academic judgment.

*See id.* at 208. We later referred to the rule we had initially stated in *Tobias* as follows:

"When a reviewing court has found evidence of 'professional judgment,' such

evidence is considered sufficient to justify judgment against a student as a matter of

law." *Nkansah v. Univ. of Tex. at Arlington*, No. 02-10-00322-CV, 2011 WL 4916355, at

---

[2]The holding we reference in *Tobias* dealt with a different concept than we review in this case—substantive versus procedural due process. 824 S.W.2d at 211. "Substantive due[-]process challenges strike at the decision itself and not at the procedures afforded the student in the academic decision-making process." *Brown v. Univ. of Tex. Health Ctr. at Tyler*, 957 S.W.2d 911, 916 (Tex. App.—Tyler 1997, no pet.). In essence, substantive due process deals with whether the government may make a decision limiting a person's rights while procedural due process deals with the protections that must be afforded when the government goes about making that decision. *United States v. Salerno*, 481 U.S. 739, 746, 107 S. Ct. 2095, 2101 (1987) (stating that "[s]o-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty'" and that "[w]hen government action depriving a person of life, liberty, or property survives substantive due[-]process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as 'procedural' due process" (citations omitted)).

10

*6 (Tex. App.—Fort Worth Oct. 13, 2011, pet. denied) (mem. op. on reh'g) (per curiam).

The rule of deference that we referenced in *Tobias* remains good law. Less than a year ago, the Fifth Circuit summarized the holdings of the same precedents we cited in *Tobias* to reiterate the rule that judicial intervention comes only in a case where a court concludes that an academic decision was based on something other than professional academic judgment:

> "When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment."... *Ewing*, 474 U.S. [at] 225, 106 S. Ct. [at 513]. "Plainly, they may not override [an academic decision] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Id.* "Courts must accept, as consistent with due process, an academic decision that is not beyond the pale of reasoned academic decision-making when viewed against the background of the student's entire career." *Wheeler v. Miller*, 168 F.3d 241, 250 (5th Cir. 1999).

*Patel v. Tex. Tech Univ.*, 941 F.3d 743, 747 (5th Cir. 2019).

Our sister courts have phrased the acceptable point of judicial intervention a bit differently than we did in *Tobias* but have still set a definite line that should not be crossed in second-guessing academic decisions; these other courts drew the line based on whether a decision was made in bad faith or was arbitrary and capricious because it was made on factors not reasonably related to academic criteria. *See Villarreal v. Tex. S. Univ.*, 570 S.W.3d 916, 923 (Tex. App.—Houston [1st Dist.] 2018, pet. filed) (per curiam) (acknowledging court's prior precedent restricting review of academic

11

decision but noting "the rule 'assumes, of course, that the academic decision was made in good faith,' because if it was made in bad faith, the university was 'not entitled to the deferential standard of review used in cases of good faith academic dismissals'"); *Alanis v. Univ. of Tex. Health Sci. Ctr.*, 843 S.W.2d 779, 784 (Tex. App.— Houston [1st Dist.] 1992, writ denied) ("If the dismissal was based upon academic grounds, the school's decision is not to be disturbed unless it was motivated by bad faith or ill will unrelated to academic performance, or was based on arbitrary and capricious factors not reasonably related to academic criteria."); *Eiland v. Wolf*, 764 S.W.2d 827, 833 (Tex. App.—Houston [1st Dist.] 1989, writ denied) ("If the dismissal was based on academic grounds, the school's decision was not to be disturbed unless it was motivated by bad faith or ill-will unrelated to academic performance[] or was based on arbitrary and capricious factors not reasonably related to academic criteria." (citing *Hines v. Rinker*, 667 F.2d 699, 703 (8th Cir. 1981), and *Wilkenfield v. Powell*, 577 F. Supp. 579, 583 (W.D. Tex. 1983)).

### 4. The due-course/due-process protections required for a student in an academic setting are slight.

What process is due in any circumstance "is measured by a 'flexible standard' that turns on the 'practical requirements of [those] circumstances.'" *Enoh*, 545 S.W.3d at 620 (citing *Than*, 901 S.W.2d at 930);[3] *see also Shah v. Univ. of Tex. Sw. Med. Sch.*, 129

---

[3]*Enoh* describes the factors that a court uses to determine the process due as a flexible standard that includes

F. Supp. 3d 480, 497–98 (N.D. Tex. 2015) (mem. op. & order) ("[D]ue process, 'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place[,] and circumstances'; instead, it is 'flexible and calls for such procedural protections as the particular situation demands.'" (citing *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 902 (1976)).

In an academic setting, the process due hinges on the nature of the underlying act and depends on whether the matter involves discipline or academic performance. *Enoh*, 545 S.W.3d at 621. A proceeding dismissing a student for a disciplinary reason may require a hearing. *Id.*[4] However, the Supreme Court has established a lower standard for decisions that are solely based on academic performance. *Id.* at 622 (citing *Horowitz*, 435 U.S. at 86, 98 S. Ct. at 953).

Precedent of the United States Supreme Court establishes that no hearing is required when a dismissal occurs for an academic reason. *Horowitz*, 435 U.S. at 86 n.3,

---

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* (citing *Than*, 901 S.W.2d at 930).

[4]We rely on the opinions of our sister courts and the federal courts for the rule establishing this distinction. The Texas Supreme Court has not definitively established the process due in an academic dismissal. *See Than*, 901 S.W.2d at 931 ("Because we conclude that Than's dismissal involved a disciplinary matter, we need not decide and express no opinion on what, if any, procedural due process must be afforded when academic dismissals are involved.").

98 S. Ct. at 953 n.3; *Enoh*, 545 S.W.3d at 621–22; *Tobias*, 824 S.W.2d at 209. The Supreme Court's rationale for not requiring a hearing echoes to some extent the reasons we outlined above regarding why we should not second-guess an academic decision: (1) academic institutions do not function in the same way as courts; (2) academic decisions are "an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking"; and (3) it would undermine the academic relationship between teacher and student to impose court-like procedures on that relationship. *Enoh*, 545 S.W.3d at 621–22 (citing *Horowitz*, 435 U.S. at 87–90, 98 S. Ct. at 953–55).

The minimal process requirements of an academic dismissal do not mean that no process is due; students who are academically dismissed must still "be given some meaningful notice and an opportunity to respond." *Id.* at 622. The formulation of what process is due provides that "a student has received all the procedural due process required [for an academic dismissal] where '[t]he school fully informed [him] of the faculty's dissatisfaction with [his] clinical progress and the danger that this posed to timely graduation and continued enrollment.'" *Shah*, 129 F. Supp. 3d at 500 (citing *Horowitz*, 435 U.S. at 85, 98 S. Ct. at 952); *Enoh*, 545 S.W.3d at 622. The process requires no more than giving the student "the opportunity to characterize his conduct and put it in proper context." *Burnett v. Coll. of the Mainland*, 994 F. Supp. 2d 823, 826 (S.D. Tex. 2014) (mem. op. & order) (quoting *Horowitz*, 435 U.S. at 86, 98 S. Ct. at 953).

### 5. The failure of a governmental entity to follow a self-established notice-and-hearing procedure does not translate into a constitutional process violation.

In making the determination of what process is due, the standard is set by the Constitution and not the dictates of an institution's internal rules or agreements: simply stating that a state actor may have violated its own standards of process is not sufficient to allege a facially valid due-course/due-process violation. In other words, the decision regarding what flexible standard of process is required in a discrete situation turns on constitutional standards and not simply the claim that a state actor has violated the entity's internal standards. *See Enoh*, 545 S.W.3d at 624 n.13. If a party has received constitutionally adequate process, the claim for a violation of an internal or promised procedure falls into a different category of claim than a constitutional violation, such as a breach-of-contract or other state-law claim. The Fifth Circuit has enunciated this principle as follows: "There is not a violation of due process every time a university or other government entity violates its own rules. Such action may constitute a breach of contract or a violation of state law, but unless the conduct trespasses on federal constitutional safeguards, there is no constitutional deprivation." *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1230 (5th Cir. 1985) (citing *Garrett v. Mathews*, 625 F.2d 658, 660 (5th Cir. 1980)); *see also Dearman v. Stone Cty. Sch. Dist.*, 832 F.3d 577, 584 (5th Cir. 2016) (same); *Whatley v. Philo*, 817 F.2d 19, 21 (5th Cir. 1987) (same); *Enoh*, 545 S.W.3d at 624 n.13 ("Dr. Enoh also emphasizes that Texas Tech did not follow its own policies in the appeal process. The procedural

15

due[-]process inquiry, however, focuses on what is constitutionally required, and not whether particular written policies were followed.").

**6. Even when there is a defect in the process originally accorded a student, a subsequent hearing may cure the original failure.**

When there is a defect in the procedural due process accorded a student, that failure may be cured by a subsequent action. *Sullivan v. Hous. ISD*, 475 F.2d 1071, 1077 (5th Cir. 1973) ("It is, however, well settled that a procedural defect in an initial hearing before school officials can be cured by subsequent hearings."); *see also Murray v. W. Baton Rouge Parish Sch. Bd.*, 472 F.2d 438, 443 (5th Cir. 1973) (same). What curative action is sufficient in the eyes of the Texas Supreme Court is unclear. *See Than*, 901 S.W.2d at 933. Apparently, a de novo hearing is sufficient, but the court would not determine whether an appellate hearing would do. *Id.* ("While *Sullivan* and *Murray* suggest that post-deprivation de novo proceedings may cure defects in the initial process, it is less clear the extent to which ordinary appellate review can cure initial procedural defects.").

**C. Application—Appellant has failed to plead a facially valid constitutional claim, and the trial court properly dismissed the suit below for lack of subject-matter jurisdiction.**

At bottom, Appellant places us in the middle of a decision that we should not second-guess. Appellant characterizes himself as being "dismissed" from medical school while the substance of his allegations is that he entered into an LOA agreement, the terms of which required that he obtain permission to "reenroll" in

16

school. Nothing tells us what permission the reenrollment process involved, but it apparently vested school administrators with the discretion to decide if Appellant could reenroll. We cannot second-guess that decision because it turns on a professional judgment of whether Appellant had the qualifications to continue to pursue a career in the highly specialized field of medicine.

Appellant then places several limitations on himself that are fatal to his appeal. Appellant acknowledges that he was not permitted to reenroll based on academic rather than disciplinary reasons. Yet, his brief does not argue or even cite the principles that govern the very limited process that a student is entitled to in an academic setting or make any effort to show why the process he received failed to meet that standard or how his petition alleged a constitutional failing to meet that standard. Further, the operative facts pleaded by Appellant are set out in two conclusory sentences that turn not on the claim that the process he received fell below a constitutional minimum but on the claim that Appellees violated the terms of an LOA agreement. Then, he acknowledges that he was able to appeal the decision but challenges the sufficiency of the appeal with a one-sentence conclusory allegation that the appeal process was not "meaningful." Operating under the limitations imposed by Appellant on his claim, and for the reasons we explain below, we conclude that Appellant has not alleged a facially valid due-course/due-process claim.

As a preliminary matter, Appellant's brief uses most of its word count to deal with two matters that are not in dispute. First, the brief elaborates on the basic

17

concept that sovereign immunity does not bar a facially valid constitutional claim. We agree that a claim is not barred when a petition asserts a facially valid constitutional claim. *See Klumb*, 458 S.W.3d at 13. Next, the brief focuses on the question of whether Appellant has a "protected liberty interest" in his medical education. No one argues that he does not.

Once he moves off topics that are not in controversy, Appellant's brief funnels down to a three-page argument that he was "not afforded the process he was due." The factual focus of his brief's argument is as narrow as the factual allegations of his petition. Though Appellant's amended petition spends most of its paragraphs intimating that there was some unfairness in how he came to be on an LOA, the process violation he alleges turns on the events by which he was denied reenrollment. Nor does his brief challenge the process that produced the LOA agreement.

Also, in an apparent attempt to give us grounds to question the decision to deny his reenrollment, he calls it arbitrary, but the context of that word's use shows that he is not claiming the dismissal decision fell outside professional judgment. Instead, he places the arbitrary label on the decision because he did not receive notice of the hearing in which the decision was reached.

To build an argument based on the claim that he did not receive notice of a hearing where an academic decision was made places that argument on a flimsy foundation. The precedents we cited above establish that an academic decision may be made without a hearing. The process that is due requires only that the school fully

18

inform the student of the faculty's dissatisfaction with his clinical progress and of the danger that this posed to timely graduation and continued enrollment. *See Shah*, 129 F. Supp. 3d at 500. Again, that process requires no more than giving the student "the opportunity to characterize his conduct and put it in proper context." *Burnett*, 994 F. Supp. 2d at 826. Appellant makes no allegations in his petition or arguments in his brief that he did not receive this level of process.

And the mechanism that he relies on to create his right to a hearing does not aid him in stating a facially valid constitutional claim. He is clear in describing what that mechanism was: Appellees dismissed him "in violation of the LOA agreement." Again, the failure of a state actor to follow an agreement or an entity's own standards does not state a constitutional violation but relegates a plaintiff to a breach-of-contract or another state-law claim. *See Enoh*, 545 S.W.3d at 624 n.13.

Appellant's argument has another self-revealed flaw; his argument devolves down further than a claim that Appellees failed to abide by the LOA agreement. Instead, there is apparently a disagreement on how Appellant and Appellees interpreted that agreement. Appellant states that the LOA agreement specified that he was to seek reenrollment "by" July but interprets the preposition to mean that he had until the end of July to reenroll. The school, however, had a different view, as apparently evidenced by consideration of Appellant's status in July. Thus, Appellant not only fails to state a valid constitutional claim because his claim lacks the proper grounding; he acknowledges, at least impliedly, that he is relying on nothing more

than a difference of opinion to establish his claim. That reinforces our conclusion that Appellant has not alleged a valid constitutional claim but rather a breach-of-contract claim that he has tried to dress in constitutional garb.

And even Appellant acknowledges that he did have some means—through an appeal—to challenge the decision that he complains about. That appeal process receives a one-sentence treatment in his petition: "[Appellant] properly appealed the decision; however, [Appellant's] request was immediately denied without any meaningful opportunity for [Appellant] to be heard." Though the supreme court has questioned whether a deprivation of due process in an academic disciplinary proceeding may be cured by an appeal process, the court has not dealt with the limited due-process rights incident to a strictly academic decision. *See Than*, 901 S.W.2d at 933. Appellant's conclusory characterization of what occurred through the "appeal" does not allege that he did not receive the limited process rights associated with an academic decision to be able to tell his side of the story. If we are to give the requirement to plead facts stating a constitutional violation any meaning and not allow it to be a meaningless formality, a pleading will have to go further than the conclusory statement that Appellant offered. Accordingly, we overrule Appellant's sole issue.

## IV. Conclusion

Having overruled Appellant's sole issue, we affirm the trial court's judgment dismissing Appellant's claim with prejudice.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: April 2, 2020